# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

SEALED,

           Plaintiff,

   v.

SEALED,

           Defendants.

Civil Action No.  **1:23CV337**

**J. BARRETT**

***QUI TAM* ACTION**
**FILED UNDER SEAL**

## COMPLAINT
## FOR VIOLATIONS OF:

**THE FEDERAL FALSE CLAIMS**
**ACT, 31 U.S.C. §§ 3729–3733**



# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN; and THE DISTRICT OF COLUMBIA; *ex rel.* DEEPTANKAR DEMAZUMDER, | Civil Action No. **1:23CV337** **J. BARRETT** <u>*QUI TAM* ACTION</u> <u>FILED UNDER SEAL</u> |
| Plaintiff, | |
| v. | **COMPLAINT** **FOR VIOLATIONS OF:** |
| THE UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE; UNIVERSITY OF CINCINNATI MEDICAL CENTER; UNIVERSITY OF CINCINNATI PHYSICIANS, INC.; UNIVERSITY OF CINCINNATI PHYSICIANS COMPANY LLC; UNIVERSITY OF CINCINNATI HEALTH; DR. JOHN BYRD; DR. CHARLES HATTEMER; and DR. ALEXANDRU COSTEA, | **THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729–3733** |
| Defendants. | |

## I.    **INTRODUCTION**

1.      The University of Cincinnati College of Medicine, University of Cincinnati Physicians, Inc.; University of Cincinnati Physicians Company LLC; University of Cincinnati Medical Center; and University of Cincinnati Health (Collectively University of Cincinnati) run the Center for Electrophysiology, Rhythm Disorders and Electro-Mechanical Interventions (Clinic). The Clinic is an outpatient facility that is responsible for evaluating and managing patients referred for concerns for disturbances of the heart's rhythm, also known as arrhythmias.

2.      The Clinic is run by Defendant Dr. John Byrd, the Chair of the Department of Internal Medicine at the University of Cincinnati, and Defendant Dr. Charles Hattemer, Division Chief of Cardiology at the University of Cincinnati. Defendant Dr. Alexandru Costea was the primary physician working at the Clinic and pushing to do as many procedures as possible. These three individual Defendants and the University of Cincinnati are collectively referred to as Defendants in this complaint.

3.      Arrhythmia means the heart is not pumping enough blood due to an irregular rhythm or rate, and an untreated arrhythmia can lead to life-threatening complications including stroke, heart failure, heart attack and cardiac arrest.

4.      The doctors at the Clinic regularly examine both new and existing patients. These evaluations are used to diagnose the patient's problems and determine whether the patient is suitable to undergo advanced surgical procedures, including ablating heart tissue and implanting permanent pacemakers and defibrillators. These exams are important and are the doctors' primary opportunity to diagnose and manage the complex life-threatening arrhythmias treated at the clinic.

-1-

5.      Instead of utilizing these exams as an important diagnosis and management tool, Defendants seek to maximize reimbursements by speeding through as many exams as possible. Defendants schedule Doctors in 15-minute increments, sometimes with multiple patients double booked in a single 15-minute window. This short window is insufficient to obtain important history and perform the necessary physical examinations. Doctors are never provided more than 30 minutes to examine a patient.

6.      However, Defendants bill Federal Healthcare as if the patients were seen for extensive exams in order to maximize reimbursements. Defendants always bill the exams as a minimum 40 minute visit and up to a 60 minute visit.

7.      Defendants are engaged in a classic upcoding scheme wherein Defendants improperly inflate the charges to federal healthcare insurers and falsely certify Defendants saw patients for longer than they actually did.

8.      These perfunctory exams have real consequences for the patients. Defendants' patients regularly have complications during and after their procedures or receive unnecessary treatment. These are exactly the type of negative outcomes thorough exams are supposed to prevent.

9.      Highlighting Defendants cavalier attitude toward federal funds, Defendants are also misusing funds from multiple National Institute of Health (NIH) grants, including charging costs to Relator's NIH grant that Defendants promised the NIH that Defendants would pay, billing time to an NIH grant for a graduate student whom Defendants knew was not working, and failing to transfer equipment purchased with federal grant funds to Relator's new employer, as required.

-2-

## II.    **PARTIES**

10.    Plaintiffs are the United States of America, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the State of Vermont, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin, and the District of Columbia (collectively without the United States the State Plaintiffs).

11.    Relator Deeptankar DeMazumder, M.D., Ph.D., was employed as a physician-scientist in Cardiac Electrophysiology (EP) by the University of Cincinnati Physicians, Inc. (UCP) from January 1, 2017, until his employment was wrongfully terminated by UCP on July 26, 2022 in retaliation for raising concerns about inappropriate billing practices. Relator was also an Assistant Professor on the tenure track at the University of Cincinnati College of Medicine (UC COM), and his employment with UC COM was contingent upon the continuation of his employment by UCP. Relator is licensed to practice medicine in Ohio and had medical staff privileges at the University of Cincinnati Medical Center ("UCMC") since 2017.

12.    Relator was a doctor in the Clinic. As discussed below, he repeatedly raised concerns about the inability to treat patients during the short time Defendants provided for each patient exam. Additionally, Relator directly saw Defendants improperly using the grant funds as alleged below.

13.     Defendant University of Cincinnati College of Medicine (UC COM) is a teaching and research entity owned by UC Health.

14.     Defendant University of Cincinnati Medical Center (UCMC) is a not-for-profit limited liability company.

15.     Defendant University of Cincinnati Physicians, Inc. (UCP) leases physicians and other employees to University of Cincinnati Physicians Company LLC (UCPC), a not-for-profit limited liability company of which UC Health is the sole member. It allegedly exists to carry out the missions of UCMC and UC COM. Its physician employees are also agents of UCMC.

16.     Defendant University of Cincinnati Health (UC Health) is an Ohio not-for-profit limited liability company. UC Health owns UCMC, and its Board of Directors act as the Board of Directors of its wholly owned subsidiary UCMC.

17.     Defendant Dr. John Byrd is the Chair of the Department of Internal Medicine at the University of Cincinnati. Dr. Byrd is a resident of the State of Ohio.

18.     Defendant Dr. Charles Hattemer is the Division Chief of Cardiology at the University of Cincinnati. Dr. Hattemer is a resident of the State of Ohio.

19.     Defendant Dr. Alexandru Costea was a physician admitted to practice at the University of Cincinnati. Dr. Costea is a resident of the State of Ohio.

### III.     JURISDICTION AND VENUE

20.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

22.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, Relators would qualify as an "original source" of the information in this Complaint, even had such a public disclosure occurred. Relators made a pre-filing disclosure of evidence to the government on May 13, 2023.

23.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they all can be found in and transact business in this District.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

## IV.     THE FALSE CLAIMS ACT

25.     The FCA provides for civil liability for "any person who (A) knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729 (a)(1).

26.     Likewise, the "Reverse False Claims" provision of the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or

knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* at § 3729(a)(1)(G).

27.     An entity acts "knowingly" under the FCA, when it: (1) has actual knowledge; (2) acts in deliberate ignorance of the truth or falsity; or (3) acts in reckless disregard of the truth or falsity. It is not necessary to prove a specific intent to defraud. 31 U.S.C. § 3729(b)(l). This Complaint uses "knowing" to describe all three definitions of knowing in the FCA.

28.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4). Compliance with informed consent and usage requirements for human tissue research is material.

29.     The State Plaintiff corollary false claims acts all have similar elements.

## V.     FEDERAL HEALTHCARE AND NIH GRANTS

### A.     Medicare

30.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the Medicare Program or Medicare).

31.     Medicare is a federally-operated health insurance program administered by CMS, a federal agency organized within the HHS. *See* 42 U.S.C. § 1395c.

32.     The Medicare program is divided into four "Parts" that cover different services. This case involves Medicare Parts A (for inpatient hospital services), B (outpatient services), and Parts C (Medicare Advantage). Medicare Part D is not directly at issue. The majority of the costs of Medicare Parts A, B, and C are paid by United States citizens through their payroll taxes.

33.     Payments are typically made to health care providers rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, who, in turn, submits its bill directly to Medicare for payment.

Case: 1:23-cv-00337-MRB Doc #: 1 Filed: 06/01/23 Page: 9 of 77 PAGEID #: 9

34.     Medical necessity is a fundamental and material requirement for Medicare coverage. Medicare does not cover any expenses incurred for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1)(A); Medicare Benefit Policy Manual (MBPM), ch. 16 § 20 (Rev. 1, 10-01-03).

35.     In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

36.     On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

37.     All healthcare providers, including Defendants, must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare and Medicaid. A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for Medicare and Medicaid services, including, but not limited to, the following:

      a.  Reimbursement only for reasonable and necessary medical services furnished to beneficiaries. *See* 42 U.S.C. § 1395y(a)(1)(A); and

      b.  Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. *See* 42 U.S.C. § 1320c-5(a)(1).

38.     Medicare regulations exclude from payment services that are not reasonable and necessary. *See* 42 C.F.R. § 411.15(k).

39.     CMS defines a "reasonable and necessary" service as one that "meets, but does not exceed, the patient's medical need" and is furnished "in accordance with the accepted standards

of medical practice for the diagnosis or treatment of the patient's condition . . . in a setting appropriate to the patient's medical needs and condition[.]" CMS, Medical Program Integrity Manual § 13.5.4 (2019).

40.     Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payments under Medicare Parts A and B on the basis of each provider's certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American Taxpayers.

41.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1395g(a).

42.     A hospital and physician's compliance with the requirements and regulations detailed above are material to Medicare's decision of whether to allow payment of claims for services provided.

**B.     Medicaid**

43.     Medicaid is a government health insurance program for low-income individuals and people with various disabilities that is jointly funded by the federal and state governments. *See* 42 U.S.C. §§ 1396 *et seq*. Each state administers its own Medicaid program, which is also governed by federal statutes, regulations, and guidelines. Ohio's Medicaid program is called the Buckeye Health Plan.

44.     The Buckeye Health Plan is administered by the State of Ohio, subject to oversight by the United States in accordance with statutes and with regulations promulgated by the Secretary of HHS. Pursuant to these statutes and regulations, the United States provides financial assistance

-8-

to each of the state Medicaid programs by providing each state with financing. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent. The Ohio FMAP is 64.3 percent in fiscal year 2023. Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient. The federal government pays to the state the statutorily established share of the "total amount expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1).

45.     The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

**C.      Other Federal Healthcare Programs**

46.     TRICARE provides health care services to eligible military personnel and their families.

47.     The Federal Employee Health Benefits (FEHB) program provides health insurance to federal employees through private insurance companies. The claims are paid by the federal government.

48.     Collectively Medicare, Medicaid, TRICARE, and FEHB are referred to as Health Insurance.

**D.      HCPCS/CPT Codes**

49.     The Healthcare Common Procedure Coding System (HCPCS) is a standardized coding system used to report items and services provided in the delivery of health care. This coding is submitted to Health Insurance to ensure the timely and orderly processing of insurance claims.

-9-

50.     HCPCS coding is based on the American Medical Association's Current Procedural Terminology (CPT), referred to as CPT codes.

51.     The Health Insurance Portability and Accountability Act of 1996 (HIPAA) mandated the use of HCPCS for all transactions involving healthcare information. This includes claims to all Federal Healthcare.

52.     Claim submissions to CMS included CPT and HCPCS codes, that identified the relevant diagnosis and services rendered. 45 C.F.R. § 162.1002(a)-(b); Medicare Claims Processing Manual, Chapter 23, § 20.7 *et seq.*

53.     CMS assigned reimbursement amounts to the various billing codes in the Physician's Fee Schedule.

54.     To qualify for reimbursement from Medicare, services had to meet the requirements of the particular code billed.

55.     Providing accurate CPT and HCPCS codes on claims submission forms is always material to and a condition of payment for Medicare. *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

56.     The proper CPT code depends on several factors, including the reason for the visit, the seriousness of the patient's problem, the number of body systems that needed to be reviewed, the relative complexity of the required medical decision-making, and the time necessary to complete the visit.

57.     When deciding which CPT code to bill Medicare, providers are required to consider only the medically necessary services they provided for the condition of the patient at the time of the visit.

58.    Because it was not feasible for Medicare to review every patient's medical records for each of the millions of claims for payments they received from providers, Medicare relied on providers to comply with requirements and submit truthful and accurate certifications and claims.

59.    Generally, once a provider submitted a claim to Medicare, the claim was paid directly to the provider without any review of medical records or other supporting documentation.

60.    Office and outpatient visit codes are billed as 92202-92205 for new patients:

a.    Code 99205 describes an office or outpatient visit with a new patient lasting 60-74 minutes. The visit must involve a comprehensive history, a comprehensive examination, and medical decision making of high complexity. This code has the highest reimbursement for new patient visits.

b.    Code 99204 describes an office or outpatient visit with a new patient lasting 45-59 minutes. The visit must involve a comprehensive history, a comprehensive examination, and medical decision making of moderate complexity. This code has the second highest reimbursement for new patient visits.

c.    Code 99203 describes an office or outpatient visit with a new patient lasting 30-44 minutes. The visit must involve a detailed history, a detailed examination, and medical decision making of low complexity. This code has the third highest reimbursement for new patient visits.

d.    Code 99202 describes an office or outpatient visit with a new patient lasting 15-29 minutes. The visit must involve a history, an examination, and medical decision making of low complexity. This code has the lowest reimbursement for new patient visits.

61.    Office and outpatient visit codes are billed as 99212-99215 for existing patients:

a. Code 99215 describes an office or outpatient visit with an established patient lasting 40-54 minutes. The visit must involve a comprehensive history, a comprehensive examination, and medical decision making of high complexity. This code has the highest reimbursement for existing patient visits.

b. Code 99214 describes an office or outpatient visit with an established patient lasting 30-39 minutes. The visit must involve a detailed history, a detailed examination, and medical decision making of moderate complexity. This code has the second highest reimbursement for new patient visits.

c. Code 99213 describes an office or outpatient visit with an established patient lasting 20-29 minutes. The visit must involve an expanded problem focused history, an expanded problem focused examination, and medical decision making of low complexity. This code has the third highest reimbursement for new patient visits.

d. Code 99212 describes an office or outpatient visit with an established patient lasting 6-19 minutes. The visit must involve a problem focused history, a problem focused examination, and medical decision making of low complexity. This code has the lowest reimbursement for new patient visits.

## VI.    DEFENDANTS ENGAGED IN UPCODING

### A. Defendants Spent Insufficient Time Conducting Exams

62.    The Clinic focuses on arrhythmias and heart conduction disorders. The Clinic regularly recommended and had University of Cincinnati doctors perform implantation of defibrillators, pacemakers, and left atrial appendage closure devices (e.g., Watchman), catheter ablation of all types of arrhythmias, and treatment for atrial fibrillation (AFib). AFib is a problem with a heart's electrical activity that can cause hearts to quiver, beat irregularly, or skip a beat.

-12-

63.     Arrhythmia can be treated through surgery, but every surgical option involves surgery on the heart. These procedures are therefore inherently high risk as any mistake or complication can lead to long term heart issues or cardiac arrest and death.

64.     Whether the patient needs treatment for their heart is a complicated medical decision. Cardiac ablation, which involves the creation of small scars inside the heart to inhibit the irregular electric signals that cause arrhythmias, carries the potential to cause damaged cardiac tissue, bleeding, blood clots in other parts of the body, and/or cardiac arrest. Additionally, insertion of a cardiac implantable electrical device (CIED) – which includes pacemakers and defibrillators – sees complications for one-in-ten patients. Furthermore, even minor post-CIED implantation complications have been associated with increased risk of cardiovascular mortality.

65.     The examinations of the patients at the Clinic are important. The examinations allow doctors to both get to know the patient and understand the patient's medical history. The doctors can then inform the patient of the risks and benefits of the surgery, involve the patients in the decision-making process, and discuss a personalized treatment plan that meets the needs of each patient. Without fully understanding the patient and the patient's medical history, the doctor cannot properly make the important decision regarding if a patient actually has an arrhythmia, what type of arrhythmia the patient has, how the arrhythmia affects the patient, and whether the patient actually needs surgery to treat their arrhythmia.

66.     Without performing a detailed physical examination, the doctor cannot plan a customized surgical approach, which is important for avoiding otherwise preventable, life-threatening complications due to the surgery and for seeking alternate management approaches including not performing the procedure at all in certain patients.

-13-

67.     Further, the Clinic is meant to treat all types of arrhythmias and heart conduction disorders. The treatments should include defibrillator and pacemaker implantation, as well as ablation of all types of arrhythmias. However, Defendants pushed the doctors in the Clinic to focus on surgeries for AFib as those surgeries are more lucrative for Defendants.

68.     The patient's exam is supposed to involve a comprehensive medical history, a comprehensive physical examination of the patient, and consideration and discussion of the highly complex treatment for heart disorders.

69.     Most patients referred to this clinic have a very complex medical history and are taking multiple medications for various other disorders. Due to the highly complex nature of treatment for heart disorders and the decision to perform surgery on a heart, the billing codes for these meetings require that the time is actually spent with the physician and does not include time spent with medical assistants or others preparing the patient to see the doctor.

70.     Defendants had a policy of booking patients in fifteen minute segments. In those fifteen minutes, the doctor is supposed to see the patient, take their medical history, perform a thorough physical examination, make a complicated medical decision about the need for a serious surgery, inform the patient of the treatment options, discuss the risks and benefits of each option, take notes, and then move on to see the next patient. In short, doctors were required to perform the work of a 40-60 minute exam in less than 15 minutes. This is impossible.

71.     For example, Dr. Alexandru Costea typically saw "32 or more patients in a full day clinic." A full clinic day is 8 a.m. to 4:30 p.m. To see 32 patients over 8 and half hours, Dr. Costea could spend less than 16 minutes with each patient, assuming the doctor did not take any breaks to use the bathroom or eat. If Dr. Costea saw 34 patients, he would have exactly 15

minutes with each patient. If Dr. Costea took breaks to use the restroom, eat, or simply collect his thoughts, Dr. Costea would necessarily have less time to spend with patients.

72.     When discussing the volume of patients Dr. Costea saw, Sherri Noonan, the Clinical Operations Director, suggested that Dr. Costea should not go to Adams County Regional Medical Center because the Clinic would then lose the patients he sees. The Clinical Operations Director was more concerned with income than the insufficient time given to the patients.

73.     Further, Dr. Costea would copy and paste the same language into all of his patient exam notes. These notes stated Dr. Costea performed a comprehensive eye exam, whether or not it was performed. Dr. Costea's copy and paste approach to notes creates danger to the patients as it fails to note any obvious abnormalities with the patients or other factors that could lead to complications.

74.     Dr. Costea also altered his notes for procedures, taking out references to complications, even when major complications occurred, all in an attempt to cover up the problems that resulted from Defendants' fraud. This practice of hiding complications was encouraged by Defendants and not limited to Dr. Costea.

75.     The unreasonable schedule of 32-34 patients in a day was not limited to Dr. Costea. Rather every doctor who practiced at the Clinic was given an unreasonable schedule and allowed only 15 minutes to see most patients. Further, Defendants encouraged all doctors to include notes that would support Defendants practice of billing for a higher level of care.

76.     Defendants' leadership recognized that only providing 15 minutes per patient is insufficient. For example, at a December 13, 2021 meeting between Relator, LeAnn Coberly, Professor of Internal Medicine and Former Chief of Staff of the hospital, Francis X. McCormack, Professor and Division Chief of Pulmonary Critical Care and Sleep Medicine, and

-15-

others, Dr. Coberly stated that, "I don't know how many can see the patient in fifteen minutes and I don't think every time someone quits the division of cardiology we can expect an asymmetric assignment of patients to some faculty and not others. I do think we have to take into consideration that it's not a livable clinical schedule. Why does that keep happening?"

77.     Another participant in the meeting, Dr. McCormack, responded, "LeAnn, I agree with you, that schedule is not sustainable. We can't do that. I don't know if it's the level of leadership or the level of schedulers because we have problems at all levels, but it's gotta change."

78.     It did not change.

79.     Relator again specifically raised the concerns with the unrealistic volume of patients in Clinic to Dr. John Byrd, Chair of the Department of Internal Medicine, and Kristin K. Cole, the Chief of Staff and Chief Administrative Officer for the Department of Internal Medicine on January 25, 2021. However, Dr. Byrd tried to avoid the topic, merely promising to "look into it."

80.     The problem persisted. In a September 8, 2021 meeting between Relator, Charles C. Hattemer (Division Chief of Cardiology), Stephen Roth (Division Administrator of Cardiology), and Sakthivel Sadayappan (Vice Chair of Research for Department of Internal Medicine), Dr. Hattemer responded to Relator again raising concerns with the clinic schedule stating, "I agree. I want to emphasize our model is a little defective. When you meet a patient, you need to establish a relationship and so you need time. We will continue to work to get better to have more support for our doctors. It's not just you, it's everybody experiencing it."

**B.     Defendants Upcoded the Short Exams to Maximize Reimbursement**

81.     Instead of billing for the 15 minute basic exams that were performed, Defendants regularly upcoded patient visits to falsely indicate patients were seen for the longer and more

thorough exams patients needed but did not receive. To cover up the fraud, the Clinic notes documented physical examinations that were never performed.

82.     For example, MT was a 66-year-old male. MT had a history of an abdominal aortic dissection (a tear in the wall of the aorta, a major artery) and had a heart attack requiring coronary artery stenting two weeks before he visited the Clinic. He was seen by Dr. Costea during a 15-minute appointment on July 14, 2021. However, Defendants billed the visit using the highest reimbursing CPT Code 99205, which is for a 60-74 minute visit. While the notes detail a physical examination, it is not possible to perform this examination in the 15 minutes Dr. Costea saw the patient.

83.     Similarly, BM was an 84-year-old male who had a heart attack that required coronary artery stenting, and was recently admitted to the hospital for bleeding in his colon (diverticular bleeding). He was seen by Dr. Costea during a 15-minute appointment on July 14, 2021. However, Defendants billed the visit using the highest reimbursing CPT code 99205, which is for a 60-74 minute visit. While the notes detail a physical examination, it is not possible to perform this examination in the 15 minutes Dr. Costea saw the patient.

84.     Additionally, the notes for BM were factually incorrect due to Dr. Costea's practice of copy and pasting standard notes. For example, the notes state BM has a normal rate and rhythm even though BM in fact had an irregular rhythm, an overt feature of his persistent atrial fibrillation for which he was referred to the Clinic. Notably, the physical exam findings are identical to those of MT.

85.     WM was a 51-year-old male. He was seen by Dr. Costea at a 15-minute appointment on July 14, 2021. However, Defendants billed the visit using CPT code 99205, which is for a 60-74 minute visit. While the notes detail a physical examination, it is not possible

-17-

to perform this examination in the 15 minutes that Dr. Costea actually saw the patient. This patient had a complex history including a cardiac bypass and grafting surgery in 2015, an artificial heart (ECMO) implantation in 2016, a heart attack in 2021 that required coronary artery stents, and surgery to repair a complication of the coronary stenting that resulted in severe injury to the blood vessels of his right leg. Despite these major cardiovascular abnormalities, Dr. Costea documents that the findings of his physical examination are completely normal. Moreover, the "vital signs" (e.g., blood pressure, heart rate) — the most fundamental requirement for any level of clinical evaluation — were not taken from this very sick patient. The rest of the physical exam findings are identical to those of MT and BM, and most of the other patients seen by Dr. Costea.

86. Between July 1, 2021 and July 21, 2022, Dr. Costea saw 1,297 patients during the Clinic. He saw five patients for only 5 minutes. He saw 173 patients for only 7.5 minutes. He saw 748 patients for only 15 minutes.

87. In total, he saw 1,122 patients for 30 minutes or less. Upon information and belief, Defendants billed each of those 1,122 patients as at least 40 minute visits.

88. The upcoding was not limited to patients seen by Dr. Costea. Defendants upcoded the bills for patients seen by other physicians at the Clinic, including Relator. This totaled thousands of patients each year.

### C. Defendants' Fraud Harmed Patients

89. The fraud led to Defendants receiving higher reimbursements for the exams than they were entitled. But the fraud also led directly to patients suffering from procedures that were unnecessary and harmful.

90. Without a proper exam, the treating physicians are unable to properly diagnose the patients' problems. This led to surgeries that would not effectively treat the problems the

patients had. And it also led to complications in those surgeries because the physicians were not properly prepared to identify potential complications.

91.     For example, JEO was a 67-year-old veteran with a history of alcoholic liver disease, liver cancer, seizures, chronic lung disease, and stroke, who was seen by Relator in the Clinic on February 9, 2021. JEO had a long history of frequently occurring premature ventricular contractions or PVCs, which are extra heart beats originating from the bottom chambers of his heart. JEO stated the PVCs used to occur very frequently, but medication prescribed about three years prior reduced the frequency. JEO was also a recovering alcoholic. Alcohol abuse can cause PVCs and abstaining from alcohol will often resolve alcohol induced PVCs.

92.     After reviewing in detail with the patient and his niece, who had a power of attorney, the risks and benefits of all potential treatment strategies, Relator obtained informed consent from the patient and his niece to perform a diagnostic electrophysiological study and a potential treatment known as radiofrequency catheter ablation in the right side of the heart if the PVCs did not continue to improve.  The risk of complications is much lower in the right heart compared to the left heart. His PVCs were also more challenging to treat by catheter ablation because the PVCs originated from the outer muscle layer of the heart known as the epicardium. Additionally, medications and abstaining from alcohol had successfully addressed this patient's symptoms and the patient was at a very high risk of complications for any procedure. Therefore, Relator recommended a conservative approach over a more aggressive intervention.

93.     However, about a year later, the Defendants scheduled the patient for a left heart PVC ablation, a riskier and more aggressive procedure. Despite Relator originally examining the patient, the surgery was scheduled with a different cardiac electrophysiology physician. The surgery was scheduled:

-19-

a.  without informing or discussing with Relator,

b.  without informing the physician doing the procedure that this patient already had
    been evaluated by Relator,

c.  without the physician performing the procedure reexamining the patient in the
    Clinic,

d.  and waiting until the day of the procedure to perform another ECG to assess the
    PVC occurrence.

94.    The patient was added to the schedule of a fellow in training and the attending

physician. Not having seen the patient in clinic or knowing the extent of the patient's symptoms,

risks, or needs, these physicians performed an aggressive left heart ablation that resulted in

tearing a hole through the heart that caused the pericardial sac around the heart to fill up with

blood so quickly that the heart stopped beating. The operating physicians had to insert a needle

through the chest to emergency drain the blood.

95.    The bleeding continued for four days. The patient was discharged from the

cardiac ICU and referred to the Veterans Administration Medical Center for follow-up.

However, despite the surgery, the patient's PVC did not improve.

96.    A few days later, the attending physician saw Relator's clinic note in the patient's

chart and called Relator on the phone to apologize for this bad outcome. The attending physician

said that he did not know Relator had evaluated the patient and that Dr. Costea had added the

patient to the attending physician's ablation schedule conveying to the attending physician that

Dr. Costea had evaluated the patient.

97.    Relator then reiterated his concerns about the unsafe practices in cardiology to

several senior physicians including the former Chief of Staff of UCMC who referred him to Dr.

John Byrd (Chair of the Department of Internal Medicine). Relator then informed Dr. Byrd. However, Dr. Byrd ignored his message at first and then, Dr. Byrd said he would meet with Relator on March 12, 2022 at 10 AM outside the hospital to discuss his findings off-record. However, on March 11, 2022 around 6:30 PM, Dr. Byrd suspended Relator citing false or fabricated allegations and instructed Relator to not have any contact with any of his patients or colleagues at work.



98.     Another example is PM, a 68-year-old man who was referred to the Clinic for evaluation for implantation of a Watchman left atrial appendage closure device. Dr. Costea performed the procedure after his normal rushed and incomplete evaluation in the Clinic. During the procedure, Dr. Costea tore a hole in the patient's heart. This led to cardiac tamponade and the patient's heart stopped pumping blood. The patient needed emergency open heart surgery and his sternum and ribs were emergently cracked open in the operating room.

99. Dr. Costea's procedure report notes that the watchman was "implanted without issue," despite writing the report after the failed surgery. By reporting no complications, the complications were hidden from the hospital's official statistics. This is one of many examples of complications that routinely are not reported but commonly occur at least in part due to the lack of a proper evaluation in clinic.

100. This type of preventable harm is further illustrated in the example of JB, a 64-year-old male who was at a high risk for having a stroke due to atrial fibrillation. The patient had been taking "blood thinning" medications for several years to mitigate this stroke risk. There were no reported side effects from the medication such as bleeding.

101. Dr. Costea proceeded to implant a Watchman left atrial appendage closure device, despite the fact that the blood thinning medication is just as effective as a Watchman as long as the medication does not create unwanted side effects.

102. A transesophageal echocardiogram before the procedure showed that the structural anatomy of the patient's heart was likely incompatible with the Watchman device implantation. However, Dr. Costea proceeded with the surgery anyways.

103. To attempt the implantation, Dr. Costea performed a "transseptal puncture" which involves puncturing a large hole in the atrial septum, the wall in the center of the heart that separates the right and left sides of the heart. Dr. Costea repeatedly tried and failed to force Watchman devices of different sizes into this patient's heart. Dr. Costea wrote in his report that, "There were no **visible** complications," however, given the multiple attempts to implant different Watchman devices, it is highly likely complications did occur.

104. After the failed procedure, Dr. Costea resumed the same blood thinning medications as before.

-22-

105.    Another example is CJ, a 66-year-old woman who "refuses" to receive heparin for religious reasons, a blood thinning medication that was required as part of the Watchman implant surgery. Dr. Costea did not notice the patient's objection to heparin until after the patient was already sedated, anesthetized, and prepped for the procedure. Therefore, Dr. Costea could not obtain informed consent from the patient. Instead of rescheduling the procedure to discuss with the patient, Dr. Costea obtained verbal consent from her husband.

106.    After the patient received heparin, Dr. Costea ultimately failed to implant the Watchman device after multiple failed attempts with multiple different devices.

**D.      Defendants Sought to Cover Up the Fraud**

107.    In the summer of 2022, Defendants began to realize that their billing practices may be questioned. Rayma Milliner, a billing coder with University of Cincinnati Physicians Company suggested changing billing entries to try to cover up the lack of time spent with the patients. Milliner provided specific language she suggested doctors use in their notes and said, "we can use these push back on any negative findings from an internal audit which I am certain

that we will see in the future."

| | |
|---|---|
| **From:** | Milliner, Rayma <Rayma.Milliner@UCHealth.com> |
| **Sent:** | Monday, July 18, 2022 6:44 AM |
| **To:** | Arvin Ejaz MD (ejazaa@ucmail.uc.edu); UCH-Steen, Dylan (Dylan.Steen); Becker, Richard (beckerrc); Das, Manisha (dasmh); Doytchinova, Anisiia (doytchat); Gerson, Myron (gersonml); Harris, David (harri2di); Jamali, Hina (jamaliha); Kakroo, Mashhood (kakroomd); Laipply, Kelly (laipplkr); Naz, Tehmina (nazt); ODonnell, Robert (odonnert); Phatak, Prajakta (phatakpa); Rubinstein, Jack (rubinsjk); Steen, Dylan (steendl); Arif, Imran (arifin); Effat, Mohamed (effatma); Ahmad, Saad (ahmadsm); Hattemer, Charles (hattemcr); Khan, Naseer (khanne); Khanagavi, Jagadish (khanagjb); Lynch, Donald (lynchdr); Sukhija, Rishi (sukhijri); Waqar, Fahad (waqarfd); UCH-Slavik, Natalie (Natalie.Slavik); Cook, Jennifer (cook3jr); Cotarlan, Vladimir (cotarlvd); Gorsi, Umama (gorsius); Newell, Tracey (newellta); Vierecke, Juliane (vierecjk); Costea, Alexandru (costeaai); DeMazumder, Deeptankar (demazudr); Muth, James (muthjn); Rajsheker, Srinivas (rajshess) |
| **Subject:** | attestation example for split shared |

**External Email: Use Caution**

Good morning All,

I came across the following article related to split shared visits and it offers some examples of the appropriate documentation. I would suggest that you add the following statement to your split shared documentation: "I provided a substantive portion of the care of this patient. I personally provided more than half of the total time dedicated to the treatment of this patient."
https://www.aapc.com/blog/84486-updates-clarify-medicare-split-shared-billing/

along with elements such as:
This was a split/shared visit. I attest that I spent [X] number of minutes out of a total [Y] number of minutes engaging in activities such as, but not limited to (when not separately reported): preparation, obtaining history, performing a medically appropriate physical exam, counseling and education, ordering appropriate medications/treatment/testing, referring and communicating with consultants, independently interpreting and discussing results of tests, determining a plan of action, performing care coordination, and creating documentation.

https://icd10monitor.com/distinct-time-versus-total-time-for-the-2022-split-or-shared-visit/

Without compliance providing us with examples of their expectations, if we follow the advice of these two articles, we can use these push back on any negative findings from an internal audit which I am certain that we will see in the future.

Rayma Milliner, CPC, CPMA
UC Health- University of Cincinnati Physicians Company

108. Doctors did in fact change the notes, however they did not change the practices

described above.

## VII.    GRANT FRAUD

### A.    Defendants Double-Billed Using Grant Funds

109.    The National Institute of Health (NIH) offers a Pathway to Independence Award

(K99/R00) for postdoctoral research scientists to receive mentored and independent research

support. The K99 is the initial phase of the award where the awardee receives mentored support

for 1-2 years. This is followed by the R00 phase where the awardee receives 3 years of

independent support contingent on their ability to secure an independent research position.

110.    Relator DeMazumder was awarded the Pathway to Independence Award in 2016.

He completed the K99 portion of this award at Johns Hopkins University from January 1, 2016

to December 31, 2016.

111.    In August 2016, Relator DeMazumder was offered a position at UCP to continue

his research. Defendants' offer letter to Relator DeMazumder explicitly stated that his offer was

"not contingent on completion of the K99 or receipt of the R00 awards."

associated with your clinical practice. We expect your NIH NHLBI Program Officer to verify
completion of your K99 requirements at the Johns Hopkins University and allow you to
transition with the R00 award. However, this offer letter is not contingent on completion of the
K99 or receipt of the R00 awards. We expect you to compete successfully for independent R01
support from the NIH during the R00 research transition award period. Your formal acceptance
is through the Department of Internal Medicine, Division of Cardiovascular Health & Disease in
accordance with the terms and conditions of the enclosed University of Cincinnati Physicians
Inc. Employment Agreement. We are also obligated to obtain an acceptable malpractice history
and, if applicable, the proper employment authorization to work in the United States.

112.    Further, Defendants promised a $2.1 million start up budget, including an

IonOptix system and microscope for Relator's lab.

> You will be provided with a start-up package estimated at approximately $2.1 million to outfit your laboratory and support your research, which includes the value of the IonOptix system and a microscope that will be purchased according to your specifications. Divisional and Departmental leadership will work closely with you in regards to lab setup. We expect this process could take at least 6 months and your business plan has been structured accordingly. This funding will be used for your continued research efforts including:
>
> (1) Primary Research - Autonomic remodeling and modulation therapy in heart failure and sudden cardiac death.
> (2) Ancillary Research – Critical Health Assessment and Outcomes study (CHAOS)
>
> These start-up funds will be available to you to purchase the requested equipment you identified, hire research personnel, fund gaps in salary only for years 4-5 and for the second half of year 3, purchase supplies and for other research expenses. Your package will include the option to hire laboratory staff - two technicians and two graduate students, into the University of Cincinnati. You will occupy approximately 1,000 sq. feet (5 benches with 10 stations on the CVC 3rd floor) of wet laboratory space. While initially, this is not commensurate with the expected funding you will be bringing to the University of Cincinnati, the College of Medicine asks its investigators to achieve a targeted funding rate of $300.00 per square foot of allocated laboratory and related support space. As part of our commitment to your research program, we will also identify roughly 500 sq. feet of dry lab space to renovate into an air conditioned dust resistant cold room for your ancillary research project in CHAOS. We commit to providing support of a statistical database manager and clinical research coordinator, both current division and/or department resources.

113.    Defendants applied to be the sponsoring organization for Relator DeMazumder's

research. As part of the application, the Defendants sent a letter to the NIH on November 7,

2016, from the Chief of the University of Cincinnati's Division of Cardiovascular Heath and

Disease, Richard Becker. That letter in part stated that the Defendants would provide Relator

"the necessary resources and support to continue his research. These are detailed in the finalized

offer letter enclosed with this application."

114.    Defendants promised to the NIH that Relator would receive his full startup funds,

including the IonOptix system and microscope, and that the startup funds would be separate and

apart from the grant funds.

115.   In January 2017, the University of Cincinnati was awarded a $249,000 grant (R00 grant) from the NIH to assist Relator DeMazumder's work in autonomic remodeling and modulation therapy in heart failure and sudden death.

116.   This funding was intended to support Relator DeMazumder's continuation of the Pathway to Independence Award.

117.   As a condition of the grant, the NIH reviewed the Defendants' offer letter to ensure the institution would provide the grant recipient, Relator DeMazumder, with the necessary materials, personnel, lab space, resources, and time to complete the research.

118.   The NIH required that the sponsoring institution "must provide a startup and salary package" and that "R00 funds may not be used to offset the typical startup package."

In addition to space, facilities, resources, and other support needed to conduct the proposed research, the sponsoring institution must provide protected research time (minimum of 9 person-months: 75% of the candidate's full time professional effort) at least for the duration of the R00 award. The start-up package and other institutional support must be described in detail and must be comparable to that given to other faculty recently hired into tenure-track or equivalent faculty positions. Institutions must provide a startup and salary package equivalent to that provided to a newly hired faculty member who does not have a grant; R00 funds may not be used to offset the typical startup package or to offset the usual institutional commitment to provide salary for tenure-track (or equivalent) assistant professors who are hired without grant support. The R00 sponsoring institution must describe the candidate's academic appointment, bearing in mind that it must be tenure-track assistant professor (or equivalent), and confirm that the appointment is not contingent on the transfer of the award to the institution. The R00 phase institution must describe how the awardee's ability to apply for and secure independent research grant (R01) support will be fostered and supported during the R00 phase of the award.

119.   The NIH approved the Defendants to conduct this grant under the belief that they had allocated start-up funds for this research and would be providing Relator DeMazumder with the lab space, personnel, and materials to conduct his research.

120.   However, after receiving the grant, Defendants informed Relator DeMazumder that they did not allocate enough funds in the startup budget to provide him with the IonOptix system and microscope.

121.   They instructed Relator DeMazumder to charge these costs to his R00 grant and informed him they would later credit the costs from his $2.1 million start-up package funds.

122.   Relator DeMazumder charged the IonOptix system, a $122,940 charge, and microscope, a $77,258.20 charge, to his R00 grant.

123. Relator later discovered that Defendants also charged these expenses to his start-up funds. Defendants were therefore double charging this approximately $210,000 charge to both Relator's start-up funds and the NIH. This is exactly what Defendants promised the NIH they would not do.

124. Relator DeMazumder informed Defendants several times that they double charged these expenses and the grant funds needed to be reimbursed, but the charges were not corrected.

125. On June 16, 2019, Relator DeMazumder emailed Sakthivel Sadayappan, Director of Heart Branch of the UC Heart, Lung and Vascular Institute and Vice Chair of the Department of Internal Medicine, and Evangelia Kranias, Director of Cardiovascular Biology, stating that Defendants had "subtracted the cost of the Ionoptix and microscope from my startup package in addition to charging it to the R00."

Hi, one more thing to add -- even though my offer letter stated that UC would buy the Ionoptix and microscope for me, John Meek (Cardiology BA at that time) informed me that there was an internal budgeting issue and that they would not be able to buy the Ionoptix and microscope for me and instead, he recommended that I use my R00 to make that purchase (see email below in which he informed Teresa Larkin that I agreed to his proposal). However, they still subtracted the cost of the Iontopix and microscope from my startup package in addition to charging it to the R00.
Thanks,
-Deep.

126. On December 18, 2020, Relator DeMazumder emailed Charles Hattemer, the Division Chief, Sadayappan, and Stephanie Donnelly, Executive Director of Business and Administration, stating he was informed that his start-up funds "weren't available at that time and

-28-

the only way I can purchase the system was by charging to my R00 and that later, those charges would be moved over to my startup. However, that adjustment has not been performed to date."

Hello all,

Thanks for taking the time to meet with me earlier today.

As discussed, below and attached are the documentation of the change of my Ionoptix purchase from my Startup funds to my R00. As documented in these emails, John Meek had blocked the purchase of the Ionoptix system using my startup funds. He told me that those funds weren't available at that time and the only way I can purchase the system was by charging to my R00 and that later, those charges would be moved over to my startup. However, that adjustment has not been performed to date.

Thanks,
-Deep.

127.     On January 12, 2021, Relator DeMazumder emailed Hattemer, Sadayappan, Donnelly, Teresa Larkin, Assistant Director of Accounting and Finance, and Marty Brookhart, Business Manager, informing them again that the "apparent double charge of my Ionoptix purchase was going to [be] adjusted."

Hello all, I just wanted to move this up on your inbox in case it got buried.
I believe the apparent double charge of my Ionoptix purchase was going to adjusted and that a detailed account of my total >$2.1M "Startup Funds" would be provided to me. As you know, the remaining funds were preallocated for equipment that are needed to achieve the aims of my active grant awards (attached).
Thanks,
-Deep.

128.     Despite Defendants' promise to the NIH and Relator DeMazumder that they would be providing the funds to purchase this machine, Defendants charged the amount to the NIH grant.

129.     The Defendants also did not fulfill their other commitments to the NIH and Relator DeMazumder such as providing lab space and personnel support. For example, the Defendants informed the NIH on November 7, 2016, that they already have provided the necessary lab space but after receiving the grant in January 2017, the Defendants informed Relator that the lab space was actually not available and needed to be identified. While continuing to spend the NIH funds, the Defendants took eighteen months to provide the lab space and an additional twelve months to release the startup funds for outfitting the space.

### B.    Defendants Submitted Fabricated Progress Reports to the NIH

130.    The NIH offers an F31 Individual Fellowship Award to aid PHD students conducting a dissertation in securing mentored research training and to support their research.

131.    In February 2020, the University of Cincinnati was awarded an FSI Individual Fellowship Award (F31 grant) from the NIH to support PHD student's work in autonomic remodeling and modulation as mechanism and therapy for sudden cardiac death in heart failure.

132.    As a condition of the grant, the University of Cincinnati was required to provide the NIH with periodical updates on the status of the student's research and use of the grant funds.

133.    However, the student did not actually perform work to support the grant. Instead, through Defendants lack of supervision, he simply did not work or show up to the laboratory where his research was to be conducted. Defendants learned this but still charged his time to the NIH.

134.    In April 2021, the student informed his dissertation committee members that he had not been completing his required work due to a personal issue.

> Over the past half-year I have been dealing with personal issues involving my relationship with my wife. Recently the situation has risen to where we are contemplating a divorce. We have consulted attorneys and are attempting counseling for the time being. As a result, these actions have had considerable impact on my research and have limited my ability to make progress. Overall, I am unsatisfied with the amount of progress I have made, and I am attempting to work diligently to catch up to the level where I should be. Consequentially, this has affected my ability to sufficiently report on my current progress in the lab, this month included.

135.    Nevertheless, the student continued to be absent from the laboratory and did not complete his required research work. Despite being absent, the University of Cincinnati paid the student his salary using the NIH grant funds.

136.    When it came time to submit the student's progress report, the University of Cincinnati submitted fabricated progress reports to the NIH which included fake and stolen data.

-30-

137. These reports alleged that the student had been making significant progress in his research and recommended that he continue to be funded by the NIH. Further, it represented that the student had actually worked when in fact much of the time he had not.

138. Rather than inform the NIH of the student's failings and return the grant funds, Defendants covered up the student's inadequate work, manipulated progress reports, and continued to charge expenses to his grant. When Relator objected to these practices, the Defendants ignored his complaints, instructed Relator to not raise the problems further, and prevented him from supervising the administration of this grant and the related work. Instead, Defendants pushed through the student's graduation to cover up the fraud.

139. These are not isolated incidents but rather illustrative of the cavalier way Defendants view NIH grants. In fact, Relator is currently requesting Defendants transfer certain federally-funded equipment to his new employer so that he may continue the work on the grant that was transferred. To date, Defendants have failed to transfer the equipment and did not list the equipment on the relinquishing statement to NIH. While the conversations are ongoing, Defendants have claimed that much of the equipment is lost. However, Relator has been told the equipment is actually being used by Defendants other employees.

## VIII. RETALIATION AGAINST RELATOR

140. Relator complained to the medical staff office and others about a series of improper billing, clinical, and administrative practices by the EP section Chief Alexander Costea, M.D. This resulted in a series of retaliations by Dr. Costea and UCP.

141. Costea prevented Relator from scheduling procedures in the EP lab and rescheduled Relator's patients for procedures with other EP physicians while increasing Relator's outpatient general clinic patients.

-31-

142.     Dr. Costea and UCP required Relator to see new patients in 15 minute appointments which was insufficient time and would lead to treatment errors, patient dissatisfaction, and incomplete clinical assessments and documentation.

143.     When Relator complained about the improper scheduling and billing errors, Dr. Charles Hattemer, Clinical Cardiology Director, suspended Relator's clinical privileges.

144.     Dr. John Byrd, Chair of Internal Medicine, changed Relator's suspension to a "pause" of Relator's clinical privileges, but the effect was identical. Relator was denied the right to do clinical procedures or see any patients. Dr. Byrd said Relator was a terrible clinician and suggested that Relator leave UCP, UCMC, and the College of Medicine ("COM").

145.     Relator disputed these accusations, and he submitted documentation and evaluations of Relator's excellent UCMC clinical performance. Dr. Byrd then said he would have Dr. Jennifer Cook perform an independent review of Relator's EP procedures and outpatient clinic records ostensibly to determine whether the suspension should be continued. Despite multiple requests, Relator was never informed of the findings of Dr. Cook's review or if she even reviewed the records. Relator's clinical practice was prohibited and the suspension continued.

146.     The retaliatory treatment continued when UCP leadership and Dr. Byrd contended that Relator committed research misconduct in Relator's research lab using expired drugs, and recommended that Relator be given an administrative suspension which was added to the clinical suspension.

147.     On March 11, 2022, at Dr. Byrd's suggestion, Dr. Andrew Filak, Dean of the College of Medicine and President of UCP, ordered that Relator be suspended from doing NIH,

-32-

DOD, and AHA funded research, and that Relator's lab be closed while UCP's Human Resources investigated the complaints of Dr. Byrd of research misconduct.

148.    Relator's lab was closed and locked, his research animals killed, and his entire staff removed from the UC premises before any investigation was commenced. Relator was never told what the so-called research misconduct was, nor was he given the opportunity to defend the erroneous claim before the penalties were assessed resulting in the loss of his innovative research on the prevention of heart attacks.

149.    After Relator was exonerated, the investigation of the research misconduct and fraud resulted in a favorable determination that Relator did not commit research misconduct, but rather an employee was responsible for the use of expired drugs with the knowledge of a graduate student protected by the COM.  The graduate student lied to the investigative committee without any penalty by the COM, and he graduated in order to avoid a COM scandal.

150.    The retaliation continued on June 27, 2022, when UCP, Dr. John Byrd, Dr. Michael Archdeacon, Chief Executive Officer of UCP, and Dr. Charles Hattemer ordered Relator to work one full day as a general cardiologist at Adams County Regional Medical Center and two sessions per week reading and documenting Holters and EKGs, all in violation of his employment contract and/or prior medical practice as an EP physician.  The effect of this would be the loss of Relator's privileges as an EP physician.

151.    Relator's restriction of EP duties and the destruction of his research lab and equipment caused Relator to write to the Defendants that he would have to look elsewhere as Dr. Byrd had told him to in January of 2022.

152.    Dr. Archdeacon, President of UCP, immediately and falsely called the letter a "resignation" by Relator and terminated his employment with UCP which then resulted in an end

to his employment by COM as a research scientist in his lab. Relator has denied repeatedly to the Defendants that he resigned, but his employment was terminated by UCP.

153.    Defendants subsequently intentionally and maliciously impugned Relator's reputation by falsely accusing Relator that he stole equipment from UC valued in excess of $200,000 and weighing thousands of pounds. Defendants reported the alleged theft to the UC Police and the State of Ohio Medical Board. This was done to further injure Relator.

## IX.    CLAIMS FOR RELIEF

### Claim for Relief I
### Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))
### Presentation of False Claims
### (All Defendants)

154.    Relators realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

155.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment of federal grants.

156.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

157.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

158.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that the Government would not have paid but for Defendants' illegal conduct.

159.    Relators cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relators have no control over, or dealings with, such entities, and has no access to the records in their possession.

160.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**
**(All Defendants)**

161.    Relator incorporate by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

162.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, in connection with the procurement and use of organ tissue for federally funded research.

163.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

164.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator have no control over, or dealings with, such entities, and has no access to the records in their possession.

-35-

165.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief III**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claim**
**(All Defendants)**

166.    Relator incorporates herein by reference each of the preceding paragraphs as if fully set forth in this paragraph.

167.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, in connection with the harvesting of human hearts to support federally funded research.

168.    The Government incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests incurred losses because an obligation to pay or transmit money to the Government was avoided, as a result of Defendants' wrongful conduct.

169.    Relator cannot at this time identify all of the avoided claims for payment that were caused by Defendants' conduct. The avoided claims were presented by numerous separate entities across the United States. Relators have no control over, or dealings with, such entities, and has no access to the records in their possession.

170.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief IV**
**Violations of the False Claims Act (31 U.S.C. § 3730(h))**
**Retaliation in Violation of the False Claims Act**
**(All Defendants)**

171.     Relator incorporates herein by reference each of the preceding paragraphs as if fully set forth in this paragraph.

172.     Relator engaged in protected activities under the FCA, including investigating and reporting Defendants' fraud internally.

173.     The FCA prohibits parties from retaliating against an employee who engages in protected conduct under the FCA. *See* 31 U.S.C. § 3730(h).

174.     After investigating and reporting potential Defendants' fraud, Relators were retaliated against by being subjected to harassment, unfair treatment, and ultimately were denied the ability to graduate from the PhD program.

175.     Defendants would not have retaliated against Relators had Relators not engaged in protected activity.

**Claim for Relief V**
**California False Claims Act**
**Cal. Gov't Code §§ 12650–12656**
**(All Defendants)**

176.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth in this paragraph.

177.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of California and/or to contractors, grantees, or other recipients of the State of California funds used to advance the State of California's interests, false and fraudulent claims for payment.

178.    The State of California paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of California funds used to advance the interests of the State of California paid claims and incurred losses, as a result of Defendants' wrongful conduct.

179.    By reason of such false and/or fraudulent claims, the State of California has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

180.    Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

181.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

182.    The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

183.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

184.    Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

185.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

**Claim for Relief VI**
**Colorado False Claims Act**
**Cal. Gov't Code §§ 12650–12656**
**(All Defendants)**

186.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

187.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Colorado and/or to contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado, false and fraudulent claims for payment.

188.    The State of Colorado paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado paid claims and incurred losses, as a result of Defendants' wrongful conduct.

189.    By reason of such false and/or fraudulent claims, the State of Colorado has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

190.    Pursuant to Col. Rev. Stat. § 25.5-4-305, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

191.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

-39-

**Claim for Relief VII**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**
**(All Defendants)**

192.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

193.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Connecticut and/or to contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut, false and fraudulent claims for payment.

194.    The State of Connecticut paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut paid claims and incurred losses, as a result of Defendants' wrongful conduct.

195.    By reason of such false and/or fraudulent claims, the State of Connecticut has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

196.    Pursuant to Conn. Gen. Stat. § 4-275, the State of Connecticut is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

197.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277.

**Claim for Relief VIII**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**
**(All Defendants)**

198.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

199.    Defendants knowingly, or acting with deliberate ignorance and/or reckless Disregard of the truth, presented and/or caused to be presented, to the State of Delaware and/or to contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware, false and fraudulent claims for payment.

200.    The State of Delaware paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware paid claims and incurred losses, as a result of Defendants' wrongful conduct.

201.    By reason of such false and/or fraudulent claims, the State of Delaware has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

202.    Pursuant to Del. Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

203.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b).

**Claim for Relief IX**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081–.09**
**(All Defendants)**

223.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

224.    This is a claim for treble damages and penalties under the Florida False Claims Act.

225.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Florida and/or to contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida, false and fraudulent claims for payment.

226.    The State of Florida paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida paid claims and incurred losses, as a result of Defendants' wrongful conduct.

227.    By reason of such false and/or fraudulent claims, the State of Florida has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

228.    Pursuant to Fla. Stat. Ann. § 68.082, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

229.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Florida pursuant to Fla. Stat. § 68.083.

**Claim for Relief X**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168 to -168.6**
**(All Defendants)**

230. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

231. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Georgia and/or to contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia, false and fraudulent claims for payment.

232. The State of Georgia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

233. By reason of such false and/or fraudulent claims, the State of Georgia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

234. Pursuant to Ga. Code Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

235. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.

**Claim for Relief XI**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21 to -31**
**(All Defendants)**

236. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Hawaii and/or to contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii, false and fraudulent claims for payment.

237. The State of Hawaii paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii paid claims and incurred losses, as a result of Defendants' wrongful conduct.

238. By reason of such false and/or fraudulent claims, the State of Hawaii has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

239. Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

240. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25.

**Claim for Relief XII**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**
**(All Defendants)**

241. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

242.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Illinois and/or to contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois, false and fraudulent claims for payment.

243.     The State of Illinois paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois paid claims and incurred losses, as a result of Defendants' wrongful conduct.

244.     By reason of such false and/or fraudulent claims, the State of Illinois has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

245.     Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

246.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b).

**Claim for Relief XIII**
**Indiana False Claims and Whistleblower Protection Act**
**Ind. Code §§ 5-11-5.5-1 to -18**
**(All Defendants)**

247.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

248.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Indiana and/or to

contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana, false and fraudulent claims for payment.

249. The State of Indiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

250. By reason of such false and/or fraudulent claims, the State of Indiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

251. Pursuant to Ind. Code § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

252. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.5-4.

**Claim for Relief XIV**
**Iowa False Claims Act**
**Iowa Code §§ 685.1–.7**
**(All Defendants)**

253. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

254. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Iowa and/or to contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa, false and fraudulent claims for payment.

255. The State of Iowa paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa paid claims and incurred losses, as a result of Defendants' wrongful conduct.

256. By reason of such false and/or fraudulent claims, the State of Iowa has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

257. Pursuant to Iowa Code § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

258. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2).

### Claim for Relief XV
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. Ann. §§ 46:437–:440
### (All Defendants)

259. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

260. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Louisiana and/or to contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana, false and fraudulent claims for payment.

261. The State of Louisiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

262.    By reason of such false and/or fraudulent claims, the State of Louisiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

263.    Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty and fine allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

264.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

**Claim for Relief XVI**
**Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §§ 2-601 to -611**
**(All Defendants)**

265.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

266.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Maryland and/or to contractors, grantees, or other recipients of the State of Maryland funds used to advance the interests of the State of Maryland, false and fraudulent claims for payment.

267.    The State of Maryland paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Maryland funds used to advance the interests of the State of Maryland paid claims and incurred losses, as a result of Defendants' wrongful conduct.

268.    By reason of such false and/or fraudulent claims, the State of Maryland has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

-48-

269.     Pursuant to Md. Health-General Code Ann. § 2-602(b)(i) and (ii), the State of Maryland is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

270.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Maryland pursuant to Md. Code Ann., Health-Gen. § 2-604(a)(1).

**Claim for Relief XVII**
**Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12, §§ 5A–5O**
**(All Defendants)**

271.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

272.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Massachusetts and/or to contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts, false and fraudulent claims for payment.

273.     The Commonwealth of Massachusetts paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts paid claims and incurred losses, as a result of Defendants' wrongful conduct.

274.     By reason of such false and/or fraudulent claims, the Commonwealth of Massachusetts has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

275.     Pursuant to Mass. Gen. Law. ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

276.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

### Claim for Relief XVIII
### Michigan Medicaid False Claims Act
### Mich. Comp. Laws §§ 400.601–.615
### (All Defendants)

277.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

278.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Michigan and/or to contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan, false and fraudulent claims for payment.

279.     The State of Michigan paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan paid claims and incurred losses, as a result of Defendants' wrongful conduct.

280.     By reason of such false and/or fraudulent claims, the State of Michigan has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

281.     Pursuant to Mich. Comp. Laws § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times

the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement presented or caused to be presented by the Defendants.

282.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a.

**Claim for Relief XIX**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01–.16**
**(All Defendants)**

283.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

284.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Minnesota and/or to contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota, false and fraudulent claims for payment.

285.    The State of Minnesota paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota paid claims and incurred losses, as a result of Defendants' wrongful conduct.

286.    By reason of such false and/or fraudulent claims, the State of Minnesota has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

287.    Pursuant to Minn. Stat. § 15C.02(a), the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

288.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

**Claim for Relief XX**
**Montana False Claims Act**
**Mont. Code Ann. §§ 17-8-401 to -413**
**(All Defendants)**

289.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

290.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Montana and/or to contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana, false and fraudulent claims for payment.

291.     The State of Montana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

292.     By reason of such false and/or fraudulent claims, the State of Montana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

293.     Pursuant to Mont. Code Ann. § 17-8-403, the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

294.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406.

**Claim for Relief XXI**
**Nevada Submission of False Claims to State or Local Government**
**Nev. Rev. Stat. §§ 357.010–.250**
**(All Defendants)**

295.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

296.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Nevada and/or to contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada, false and fraudulent claims for payment.

297.     The State of Nevada paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada paid claims and incurred losses, as a result of Defendants' wrongful conduct.

298.     By reason of such false and/or fraudulent claims, the State of Nevada has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

299.     Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

300.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

**Claim for Relief XXII**
**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2A:32C-1 to -18**
**(All Defendants)**

301.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

302.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Jersey and/or to contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey, false and fraudulent claims for payment.

303.     The State of New Jersey paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey paid claims and incurred losses, as a result of Defendants' wrongful conduct.

304.     By reason of such false and/or fraudulent claims, the State of New Jersey has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

305.     Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

306.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5.

### Claim for Relief XXIII
### New Mexico Medicaid False Claims
### N.M. Stat. Ann. §§ 27-14-1 to -15
### (All Defendants)

307.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

308.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico Medicaid program and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico Medicaid program, false and fraudulent claims for payment.

309.    The State of New Mexico Medicaid program paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico Medicaid program funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

310.    By reason of such false and/or fraudulent claims, the State of New Mexico Medicaid program has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by the New Mexico Medicaid False Claims Act for each violation.

311.    Pursuant to N.M. Stat. Ann. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

312.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-8.

**Claim for Relief XXIV**
**New Mexico Fraud Against Taxpayers Act**
**N.M. Stat. Ann. §§ 44-9-1 to -14**
**(All Defendants)**

313.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

314.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico, false and fraudulent claims for payment.

315.    The State of New Mexico paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

316.    By reason of such false and/or fraudulent claims, the State of New Mexico has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

317.    Pursuant to N.M. Stat. Ann. §44-9-3(C), the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

318.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

**Claim for Relief XXV**
**New York False Claims Act**
**N.Y. State Fin. Law §§ 187–194**
**(All Defendants)**

319. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

320. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New York and/or to contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York, false and fraudulent claims for payment.

321. The State of New York paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York paid claims and incurred losses, as a result of Defendants' wrongful conduct.

322. By reason of such false and/or fraudulent claims, the State of New York has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

323. Pursuant to N.Y. State Fin. Law § 189(1), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

324. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2).

**Claim for Relief XXVI**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 to -618**
**(All Defendants)**

325.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

326.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of North Carolina and/or to contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina, false and fraudulent claims for payment.

327.     The State of North Carolina paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina paid claims and incurred losses, as a result of Defendants' wrongful conduct.

328.     By reason of such false and/or fraudulent claims, the State of North Carolina has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

329.     Pursuant to N.C. Gen. Stat. § 1-607(a), the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

330.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

**Claim for Relief XXVII**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63, §§ 5053–5053.7**
**(All Defendants)**

331. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

332. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Oklahoma and/or to contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma, false and fraudulent claims for payment.

333. The State of Oklahoma paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma paid claims and incurred losses, as a result of Defendants' wrongful conduct.

334. By reason of such false and/or fraudulent claims, the State of Oklahoma has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

335. Pursuant to 63 Okla. Stat. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

336. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.3.

**Claim for Relief XXVIII**
**Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to -9**
**(All Defendants)**

337.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

338.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Rhode Island and/or to contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island, false and fraudulent claims for payment.

339.     The State of Rhode Island paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island paid claims and incurred losses, as a result of Defendants' wrongful conduct.

340.     By reason of such false and/or fraudulent claims, the State of Rhode Island has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

341.     Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

342.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

## Claim for Relief XXIX
## Tennessee Medicaid False Claims Act
## Tenn. Code Ann. §§ 7-5-181 to -185
## (All Defendants)

343.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

344.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Tennessee and/or to contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee, false and fraudulent claims for payment.

345.    The State of Tennessee paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee paid claims and incurred losses, as a result of Defendants' wrongful conduct.

346.    By reason of such false and/or fraudulent claims, the State of Tennessee has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

347.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

348.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b).

**Claim for Relief XXX**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001–.132**
**(All Defendants)**

349.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

350.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Texas and/or to contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas, false and fraudulent claims for payment.

351.     The State of Texas paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas paid claims and incurred losses, as a result of Defendants' wrongful conduct.

352.     By reason of such false and/or fraudulent claims, the State of Texas has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

353.     Pursuant to Tex. Hum. Res. Code Ann. § 36.052, the State of Texas is entitled to the full amount received by the person benefiting from the fraud, two times the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

354.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

### Claim for Relief XXXI
### Vermont False Claims Act
### Vt. Stat. Ann. tit. 32, §§ 630–642
### (All Defendants)

355.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

356.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Vermont and/or to contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont, false and fraudulent claims for payment.

357.    The State of Vermont paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont paid claims and incurred losses, as a result of Defendants' wrongful conduct.

358.    By reason of such false and/or fraudulent claims, the State of Vermont has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

359.    Pursuant to 32 V.S.A. §§ 631-32, the State of Vermont is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

360.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

**Claim for Relief XXXII**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.1 to .19**
**(All Defendants)**

361. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

362. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Virginia and/or to contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia, false and fraudulent claims for payment.

363. The Commonwealth of Virginia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

364. By reason of such false and/or fraudulent claims, the Commonwealth of Virginia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

365. Pursuant to Va. Code Ann. § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

366. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(a).

**Claim for Relief XXXIII**
**Washington State Medicaid Fraud False Claims Act**
**Wash. Rev. Code §§ 74.66.005–.130**
**(All Defendants)**

367.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

368.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Washington and/or to contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington, false and fraudulent claims for payment.

369.     The State of Washington paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington paid claims and incurred losses, as a result of Defendants' wrongful conduct.

370.     By reason of such false and/or fraudulent claims, the State of Washington has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

371.     Pursuant to Rev. Code Wash. § 74.66.020(1), the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

372.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

**Claim for Relief XXXIV**
**Wisconsin False Claims for Medical Assistance Law**
**Wis. Stat. § 20.931 *et seq***
**(All Defendants)**

373. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

374. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Wisconsin and/or to contractors, grantees, or other recipients of the State of Wisconsin funds used to advance the interests of the State of Wisconsin, false and fraudulent claims for payment.

375. The State of Wisconsin paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Wisconsin funds used to advance the interests of the State of Wisconsin paid claims and incurred losses, as a result of Defendants' wrongful conduct.

376. By reason of such false and/or fraudulent claims, the State of Wisconsin has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

377. Pursuant to Wis. Stat. § 20.931, the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

378. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Wisconsin pursuant to Wis. Stat. § 20.931.

**Claim for Relief XXXV**
**The District of Columbia False Claims Law**
**D.C. Code §§ 2-381.01 to .09**
**(All Defendants)**

379.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

380.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the District of Columbia and/or to contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia, false and fraudulent claims for payment.

381.    The District of Columbia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

382.    By reason of such false and/or fraudulent claims, the District of Columbia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

383.    Pursuant to D.C. Code Ann. § 2-381.02, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

384.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-308.15(b)(1).

**Demand for Jury Trial**

385.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

**Prayer for Relief**

WHEREFORE, Relator, acting on behalf of and in the name of the United States, demand and pray that judgment be entered in favor of the United States and the Plaintiff States against the specified Defendants on Counts I through III and V through XXXV of the Complaint as follows:

A.    For treble the amount of the United States' damages, plus civil penalties of $25,076, adjusted for inflation, for each false claim;

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the California False Claims Act, Cal. Gov't Code §§ 12650–12656;

C.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Colorado Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310;

D.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 to -289;

E.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201–1211;

F.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Florida False Claims Act, Fla. Stat. §§ 68.081–.09;

G.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to -168.6;

H.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 to -31;

I.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1–175/8;

J.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions,

plus a civil penalty for the maximum amount allowed by statute, for each violation of the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18;

K.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of Iowa False Claims Act, Iowa Code §§ 685.1–.7;

L.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437–:440;

M.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 to -611;

N.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages Commonwealth of Massachusetts has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O;

O.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Michigan Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615;

P.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Minnesota False Claims Act, Minn. Stat, §§ 15C.01–.16;

Q.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 to -413;

R.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Nevada statute concerning Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250;

S.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18;

T.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15; and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14.

U.      That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of New York has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

New York False Claims Act, N.Y. State Fin. Law §§ 187–194;

V.      That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of North Carolina has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 to -618;

W.      That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Oklahoma has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;

X.      That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Rhode Island has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9;

Y.      That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Tennessee has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185;

Z.      That this Court enter judgment against Defendants in an amount equal to two

times the amount of damages the State of Texas has sustained because of Defendants' actions,

plus a civil penalty for the maximum amount allowed by statute, for each violation of the Texas

Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132;

AA.     That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Vermont has sustained because of Defendants' actions,

plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642;

BB.     That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the Commonwealth of Virginia has sustained because of

Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each

violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to .19;

CC.     That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Washington has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130;

DD.     That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of Wisconsin has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq*;

EE.     That this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the District of Columbia has sustained because of Defendants'

actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09;

FF.     For all costs of this civil action including attorneys' fees;

-73-

GG.     That Relator be awarded the maximum amount allowed under the FCA; and,

HH.     For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Relator, on his own behalf, demand and pray that judgment be entered in Relators' favor against Defendants on Count IV of the Complaint as follows:

II.     Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

JJ.     Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

KK.     Punitive damages to punish Defendants for malicious acts of retaliation and to deter it from similar retaliatory conduct toward other employees, in an amount to be determined at trial;

LL.     Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by Defendants' retaliation against a whistleblower;

MM.     Reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

NN.     Such other and further relief that this Court may deem just and equitable.

Dated: June 1, 2023                          **BLACK & BUFFONE PLLC**

By: _/s/ Samuel J. Buffone Jr._

Samuel J. Buffone, Jr.
John W. Black
1400 Eye St. NW, Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com

By: _/s/  Mark J. Byrne_

Mark J. Byrne (0029243)
Kenneth F. Seibel (0025168)
Jacobs, Kleinman, Seibel & McNally LPA
30 Garfield Place, Suite 905
Cincinnati, Ohio  45202
Telephone:  (513) 381-6600
mbyrne@jksmlaw.com
kseibel@jksmlaw.com

*Attorneys for Plaintiff-Relators*
*DeMazumder Deeptankar*